Mullen Chevrolet Company v. Commissioner.
Mullen Chevrolet Co. v. Commissioner
Docket No. 25819.
United States Tax Court
1951 Tax Ct. Memo LEXIS 155; 10 T.C.M. (CCH) 682; T.C.M. (RIA) 51223; July 31, 1951
Frederick D. Dassori, Esq., 1775 Broadway, New York, N. Y., for the petitioner. Earl C. Crouter, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in income tax for 1946 of $17,185.99 resulting from the disallowance as a deduction of $45,226.29 out of total compensation of $70,226.29 paid to petitioner's president. Some of the facts were stipulated. Findings of Fact The stipulated facts are hereby found. Petitioner is a California corporation organized in November 1936 as the Jimmy Dixon Chevrolet Company for the purpose of servicing and selling motor vehicles and automobile accessories. The corporate name was changed to Westlake Chevrolet Company in October 1937 and to Mullen Chevrolet Company in January 1945. Petitioner's place of business *156 is located in Los Angeles, California. Its tax return was filed with the collector of internal revenue in Los Angeles, California. Petitioner was originally set up by General Motors Holding Corporation, hereinafter called the Holding Company, which was established by General Motors Corporation in 1929 to promote the greater effectiveness of its automobile dealer organizations by providing supplemental financial support for approved dealerships, and by providing financial assistance to individuals of ambition, ability, and potentiality, whose restricted financial resources did not permit them to qualify for dealerships. In furtherance of this plan, the Holding Company invested more than $8,800,000 in some 400 existing and new dealerships during the period from 1929 to 1936 when the Holding Company was dissolved and its operation assumed by General Motors Corporation. Where new dealerships were established it was the standard practice to create a local corporation with two classes of stock: Class A stock (with voting rights) being held by the Holding Company, and Class B stock by the local operator, with no voting rights so long as Class A stock was outstanding; both classes of stock *157 shared equally in any dividends declared. It was also the usual practice for the Holding Company to advance approximately 75 per cent of the initial capital and the operator the remaining 25 per cent, though in some instances the Holding Company supplied a greater percentage of the capital. Under this nationwide plan the operator was paid a basic monthly salary by the local company, and in addition the company entered into a standard bonus agreement with the operator whereby the latter was to receive, in addition to his salary from year to year, "a bonus equivalent to 50% of * * * [the dealer company's] net earnings * * * in excess of 15% per annum on its average month-end invested capital during said year." Dividends in an amount equal to 15 per cent of the capital employed were deducted from profits prior to computation of the bonus. It was contemplated that a substantial part of the bonus and all dividends received from the business by the operator be used for acquiring the interest of the Holding Company in the local company on the basis of the book value of its holdings to the end that, as the business prospered and earnings accrued, the Holding Company's share would be retired *158 automatically, and when completely eliminated, the operator would become the sole owner of the business. In line with the foregoing plan, petitioner's articles of incorporation authorized the issuance of 500 shares of Class A stock and 750 shares of Class B stock, each with the par value of $100 per share. Following its incorporation in November 1946, 250 shares of petitioner's Class A (voting) stock were issued to the Holding Company. One hundred shares of Class B (non-voting) stock were issued to Jimmy Dixon. At the first meeting of the board of directors on November 10, 1936, he was elected president, his salary fixed at $500 per month, and the standard bonus agreement between petitioner and Jimmy Dixon was duly executed. General Motors Corporation granted petitioner a Chevrolet dealer franchise (which has been renewed from year to year) for a specified portion of Los Angeles. Petitioner did not prosper under Jimmy Dixon's management. General Motors Corporation proceeded to look around for someone else to take over petitioner's operation. Joe E. Mullen was approached and he agreed to accept the job. Dixon accordingly resigned as president and director on October 13, 1937, and *159 General Motors Corporation repurchased his outstanding Class B stock. Mullen was thereupon elected a director and president of petitioner on October 15, 1937, and his salary was fixed at $500 per month. The remaining two directors were employes of the Holding Company. The usual bonus agreement was duly entered into by petitioner with Mullen on October 16, 1937. That agreement provides, in part, as follows: "3. The Dealer Company agrees to pay the Operator, as its President, in addition to his salary, a bonus equivalent to 50% of its earnings from October 16, 1937 through December 31, 1938 (and thereafter from calendar year to calendar year) in excess of 15% per annum on its average month-end invested capital during said year or period. "4. Earnings as used in the foregoing paragraph shall mean the net profits of the Dealer Company, after provision for income taxes, but before deducting the bonus expense herein provided for. The accounting and reserve policies and procedures adopted from time to time by the Dealer Company shall be used as the base for determining said earnings and profits. * * *
"7. This agreement shall automatically cease and determine if and when the Operator, *160 by reason of death, resignation or removal, ceases to be the President of the Dealer Company. "8. In the event of such termination, the bonus arrangement provided for in Section 3 above shall be cancelled and wholly voided commencing with the then current year, provided however, that the Board of Directors of said Company may in their discretion grant to the Operator a bonus for said year on such terms and conditions as they may feel are justified. "9. The Operator recognizes and acknowledges the absolute right of the Board of Directors of the Dealer Company to remove him as President at any time and to thereby terminate the bonus arrangement herein provided for." On October 19, 1937, Mullen became a stockholder, purchasing 40 shares of petitioner's Class B (non-voting) stock. At the time he took over this dealership in Los Angeles in 1937, Mullen, then 31 years of age, had had the following training and experience. As a youngster of eight he had a paper route and with his profits from this enterprise raised and sold chickens and mushrooms. At the age of 13 he gained additional experience in handling money and records working in a confectionery store and restaurant. While in *161 high school he kept records for his father's small portable sawmill business, checked shipments, and purchased supplies. Later he obtained a position with a branch of the Bank of Canada as savings account bookkeeper, and still later as bookkeeper, salesman and collector for a retail lumber company. In 1926 (at the age of 20) Mullen went to work for General Motors Corporation, Chevrolet Division, in Detroit in the manufacturing accounting department, continuing his studies at night accounting school. During the next two years he gained a knowledge of automobile accounting and purchasing, claims adjusting, and auditing, with some experience in traffic. In 1928 he was transferred to the Chevrolet Motor Company in Oakland, California. Believing himself sufficiently versed in automobile accounting practices and desirous of acquiring sales experience, he became a full-time automobile salesman in 1929 for a Chevrolet dealer in Oakland. There he correlated and analyzed leads and appointed agents to help locate prospects in two large plants in the area. Within a year he was top salesman for that dealer and made Chevrolet's 100 Car Club. In 1931 he became a salesman on a commission basis *162 for Cochran and Celli, the oldest Chevrolet franchise dealer in California. He was permitted to appraise tradeins. In 1934 he was offered the position of assistant sales manager which, because of a polio attack, he could not accept until he returned to work in 1935. In this position he developed a washout sheet, an accounting innovation which traced profits or losses beginning with the new car sale and concluding with the sale of the car traded in. This accounting practice disclosed that many of the company's high production men were poor traders while those with lower sales records were earning more profit for the company. This information resulted in a distinct change in the company's operations. Within 90 days he became general sales manager, a position he took at a reduction in salary in order to gain managerial experience. He proceeded to overhaul the company's entire accounting system by installing the General Motors system he had learned in Detroit. He coordinated the various departments and introduced accessory selling. During 1936 he had 13 salesmen under him who made the 100 Car Club, a record written up in the Chevrolet National Magazine. In 1937 General Motors Corporation. *163 Chevrolet Division, asked him to take a dealership in East Oakland. He declined this offer because his employer told him he would not have him as a competitor. It was at this point that Mullen was approached by the regional manager of the Holding Company to operate petitioner. At that time he was earning $550 per month as general manager of Cochran and Celli, with some prospect of a partnership. Knowing that there had been previous failures at petitioner's location and that it might take a long time and considerable work to develop this dealership, Mullen requested a higher basic salary. The prospect of bonus payments and the opportunity to gain full ownership of petitioner won Mullen over, however, and he accepted a lower basic salary of $500 per month. Upon taking over petitioner's operations, Mullen found business affairs and prospects in poor condition. The new car showroom was on a busy street; because of traffic regulations it was difficult to get into during morning and evening rush hours. The service area was small (60 foot X 65 foot) with eight pillars - only a half dozen cars could be accommodated at one time. The approach was by a ramp with a hazardous sharp four-foot *164 drop. Three cars could block the passageway. Petitioner's used car lot across the street had a 45-foot frontage, sufficient for only one display car on each side of a middle driveway. The parts and accessories department was located under the stairway of the mezzanine. The few parts on hand were obsolete and had been purchased hit or miss by a parts manager who received kickbacks. It was necessary to send out and buy from other Chevrolet dealers practically all parts needed for servicing and repair purposes. Petitioner at that time had no parts warehouse. Used cars were stored on different floors in a garage five or six blocks away. Painting and body work was done at another location an equal distance from petitioner's place of business. The shop equipment was old and badly worn and had to be replaced within two years. Used cars on hand acquired by trade-ins were in bad condition; they were covered with grime, windows were open, tires deflated, batteries dead, and fenders dented. Although inventoried at $37,000 a reappraisal showed they were worth only $10,000. Salesmen and their relatives were using the better cars for personal use. Petitioner's operating expenses were high in proportion *165 to gross income. Personnel with petitioner at that time was not of high caliber. Salesmen kicked back a portion of their commissions to get sales approved by their superiors and took questionable paper which petitioner subsequently endorsed with recourse. When repossessions became necessary petitioner customarily bore the loss. Because of previous changes in dealers at this location, and the questionable methods of some of its salesmen, petitioner enjoyed no good will. Mullen, upon taking over the dealership, initiated steps to improve petitioner's condition. He removed the sales manager and brought in a man from Oakland who he knew could be trusted. He likewise replaced the used car manager and the office manager. The process of removing disloyal, untrustworthy and incapable employes took most of a year, capable replacements being difficult to obtain and Mullen being new in Los Angeles. He reduced monthly operating costs by the middle of 1938 about one-half and at the same time developed a more efficiently operated business. He closed the separate warehouses and body shop and placed the body shop and painting shop for new cars under one roof in new rented quarters. Although he *166 would have preferred to dispose of the existing used car inventory at wholesale for what it would bring, General Motors Corporation insisted that these cars be reconditioned and retailed. This tied up petitioner's sales and service facilities and required Mullen to devote his energies to these used cars rather than new car sales for most of 1938 and 1939. In addition, petitioner during this same period had to repossess cars and take over questionable paper which Dixon had previously endorsed. In October 1939 petitioner removed its operations to its present address on South Vermont Avenue, a location then being used by an automobile agency not dealing in Chevrolets. The facilities were better and the rental was $450 a month, a compared to $800 a month at the old location. Mullen immediately launched an advertising campaign and gave better allowances on tradeins in order to develop a following at the new location. As president and general manager, Mullen set up the following subordinate department heads: A new car manager, a used car manager, a service manager, a parts manager, an office manager, a body shop foreman, and an insurance department supervisor. He inaugurated monthly dinners *167 and business meetings of all department heads to present reports and forecasts and to discuss mutual problems, thus relieving friction. An incentive pay system was introduced in all departments providing a basic salary plus a percentage of profits. As a result of this plan several of petitioner's key personnel have been with the company since 1940. In the service department Mullen established a case history record of each car serviced. In this way the car owners knew when their brakes were last lined, their car lubricated, and when all other services had been rendered. In 1941, foreseeing the imminence of war and an attendant curtailment of automobile production, Mullen deliberately reduced the sale of new cars by 50 per cent beginning in September of that year and commenced stocking new cars (98 in number) to help tide the company over for the war years ahead. He adopted the policy of releasing approximately 25 per cent of this stock of new cars each year and as he sold each new car, he endeavored to obtain a late model trade-in, so as to obtain a maximum of sales. In 1942 Mullen inaugurated a follow-up system based on his case history record of cars serviced, inviting the owners *168 to return for new lubrication jobs and other services. The service department activities increased substantially in succeeding years. A more aggressive campaign to buy and sell used cars was undertaken in 1943 and continued with greater emphasis in succeeding years. Beginning in 1944 surplus vehicles were obtained from the government. Either Mullen or his sales manager visited Army camps as far away as San Francisco, San Diego, Las Vegas, and Denver, inspected and tested the surplus vehicles, and submitted bids. Additional storage facilities at 181 Bimini Place, Los Angeles, were leased March 1, 1944, and purchased December 11, 1945, for $22,500 to take care of expanding business. $14,000 of this purchase price was still owing December 31, 1946. Mullen's salary as president remained at $500 per month from October 15, 1937, until increased to $575 commencing December 1, 1941. On January 26, 1944, the directors authorized another increase in his salary from $575 to $750 per month, but application for approval of this increase was made to the Salary Stabilization Office and denied. During the war Mullen was an O.P.A. tire inspector with the local rationing board which was located *169 for a time at petitioner's place of business. In 1942 he assisted the Red Cross in training its women auxiliary corps. In 1944 he was president of the local Kiwanis Club and participated in a number of civic activities during that year. He had no outside activities in 1946. With his salary, bonus, and dividends Mullen began in 1941 to purchase the Class A stock held by General Motors Corporation. By June of 1945 all Class A stock had been acquired by Mullen who then became the sole owner of all of petitioner's 450 outstanding shares. Upon becoming the sole stockholder of petitioner, Mullen embarked upon an enlargement and modernization program. The interior of the main store was rebuilt and modernized along with the Bimini property. Petitioner's inventory was enlarged. In December 1946 petitioner purchased two lots adjoining its South Vermont location for $60,000, borrowing the money to make the purchase from General Motors Corporation. In 1946 Mullen devoted 100 per cent of his time to being petitioner's president and one of its directors. He went to work at 9:00 A.M. at the latest, and either he or the sales manager remained there until the place was locked up at 9:00 P.M. *170 Accompanying Mullen on the Board of Directors were his brother, Leo, and J. R. Cornwall, both of whom he appointed. During the war years and during 1946 he had no vacation except for a business trip to Canada of a few days' duration. During 1946 he represented petitioner in all financial dealings, functions theretofore supervised by the Holding Company. All department heads reported directly to him. He supervised the accounting, handled legal matters and institutional advertising, prepared forecasts, and continued his department head meetings. He maintained a daily operating control showing a complete picture of petitioner's entire operation - new car and used car transactions, service and parts sales. In 1946 Mullen personally handled the sale of practically all new cars to see that they went into the hands of legitimate buyers for their own use and not for resale at a profit. The gross profits from his own personal sales totaled $96,441. Petitioner's quota of new cars for 1946 was based on shipments received in 1941. New cars could be readily sold in 1946. Petitioner had no one other person in its organization with background equal to Mullen's to take over his functions. The *171 salary and bonus which petitioner paid its president-operator, the commissions which it paid to salesmen, the dividends which it paid its stockholders, and the net profit for each of the years 1936 through 1946 are shown in the following table as taken from the annual financial statement: Net Profit
Year
Operator
Salesmen's
before Opera-
Ending
Salary
Bonus
Commissions
Dividends
tor's Bonus
1936
$1,000.00
$ 3,997.30
$ 739.20
$ 93.57
1937
5,750.00
32,103.65
13.17
(15,892.22)
1938
6,000.00
19,176.14
( 9,199.42)
1939
6,000.00
20,900.83
( 3,398.06)
1940
6,000.00
$ 22.62
28,740.69
10,505.93
1941
6,825.00
10,617.40
31,210.32
19,771.01
31,003.93
1942
6,900.00
1,629.80
2,036.66
4,148.48
10,335.17
1943
6,900.00
3,627.99
1,636.52
14,466.15
13,661.30
1944
6,900.00
10,119.89
1,283.50
12,634.50
26,214.36
1945
7,425.00
8,487.04
5,638.79
10,507.38
27,154.21
1946
9,000.00
61,226.29
25,045.34
6,000.00
* 170,865.47
*172 In 1946 petitioner declared dividends of $6,000. During the years 1936 through 1946 the gross sales and profits for each department and the total of all departments of petitioner's operation were as follows: NEW CAR SALES
USED CAR SALES
SERVICE DEPT.
Gross
Gross
Gross
Gross
Gross
Gross
Year
Sales
Profit
Sales
Profit
Sales
Profit
1936
$ 82,457.67
$ 17,547.57
$ 21,395.88
$ 720.00
$ 6,803.73
$ 3,808.88
1937
479,900.38
109,307.17
246,693.76
(19,255.71)
61,574.95
34,747.15
1938
249,435.74
56,917.32
181,240.38
(12,914.49)
46,756.89
23,406.81
1939
332,342.48
82,292.56
195,069.92
(21,857.30)
51,519.77
24,808.33
1940
471,437.63
117,569.69
219,796.70
(34,817.27)
53,157.45
25,548.44
1941
607,868.30
143,893.78
239,267.71
(23,493.23)
67,209.24
33,980.02
1942
62,115.98
17,716.19
58,014.52
10,078.17
53,299.56
28,830.84
1943
47,370.09
16,162.62
52,457.93
13,982.24
74,300.67
41,815.06
1944
45,355.25
16,165.39
43,842.35
10,458.59
90,280.80
51,619.16
1945
81,126.85
25,675.41
97,827.60
27,366.56
93,193.06
48,035.44
1946
417,754.21
105,809.59
254,057.91
117,242.39
111,253.15
55,935.85
*173 PARTS & ACCESS.
Gross
Gross
Year
Sales
Profit
1936
$ 4,350.75
$ 1,395.05
1937
48,534.68
11,999.65
1938
34,256.86
10,326.18
1939
38,442.80
10,305.29
1940
38,586.66
10,582.42
1941
47,899.81
15,298.76
1942
41,179.95
15,685.09
1943
61,833.04
24,197.88
1944
75,885.29
31,846.16
1945
92,803.95
33,527.44
1946
123,782.06
46,736.28
Total All Departments
Gross
Gross
Year
Sales
Profit
1936
$115,008.03
$ 23,471.50
1937
836,703.77
136,798.26
1938
511,689.87
77,735.82
1939
617,374.97
95,458.88
1940
782,978.44
118,883.28
1941
962,245.06
169,697.33
1942
214,610.01
72,310.29
1943
235,961.73
96,157.80
1944
255,363.69
110,089.30
1945
364,951.46
134,604.85
1946
906,847.33
325,724.11
For the years 1936 through 1946 the company sold the following number of new and used cars (including trucks): Year
New Cars
Used Cars
1936
97
59
1937
569
954
1938
279
678
1939
375
737
1940
527
840
1941
635
818
1942
52
129
1943
34
84
1944
31
55
1945
53
118
1946
286
288
The average number of employes and the average monthly salary for the key *174 employes from 1941 through 1946 are shown in the following table: Number of
Year
Employes
Sec.-Treas.
Serv. Mgr.
Parts Mgr.
Sales Mgr.
1941
50 $175 $268 $155 $359
1942
21
186
220
158
289
1943
20
215
300
222
250
1944
22
215
325
243
250
1945
30
220
267
267
437
1946
36
375
500
358
1,167
A reasonable salary allowance for Mullen during the year in controversy was $35,000. Opinion That the mere existence of an earlier arms-length agreement does not necessarily sanction the present arrangement for compensating petitioner's president and sole stockholder must now be taken as settled. University Chevrolet Company, Inc., 16 T.C. - (June 29, 1951); S. & R. Chevrolet Company, Inc. v. Birmingham (D.C., N.D., Ia.), - Fed. Supp. -. The proceeding remains to be disposed of on the basis of recognized criteria as to reasonable compensation for the services rendered. Mullen's qualities as an aggressive, competent, and successful operator of an automobile agency cannot on this record be disputed. Undoubtedly he was entitled to something more than the $17,000 or so annually which he had received in petitioner's best previous *175 years. But it is also a fact that respondent has made some allowance for such factors in permitting increased compensation over prior years; that new cars virtually sold themselves in 1946, the year we are considering; that capital as well as services was an essential incomeproducing factor in petitioner's business; and that dividends were actually decreased in what is urged as petitioner's most profitable year. Perhaps most significant of all is the testimony of petitioner's own witnesses. Although giving their opinions that the compensation paid to Mullen in 1946 was reasonable, they demonstrated by their own situations that it was obviously excessive. One received compensation as manager of his partnership of $24,000 annually. The other was paid, with his son, as drawing accounts in a similar partnership, $30,000 in the same year. Both businesses were roughly comparable with, or larger than, petitioner's. Other employes, not financially interested, received varying amounts from about $7,000 to $22,000. The highest specific salary mentioned was $30,000 said to have been paid to some sales managers in other agencies. After a careful survey of all the circumstances, we have accordingly *176 reached the conclusion as incorporated in our ultimate finding that the highest reasonable figure allowable as a deduction for the personal services of petitioner's president is $35,000. See Hoffman Radio Corp. v. Commissioner (C.A. 9), 177 Fed. (2d) 264. Decision will be entered under Rule 50. Footnotes
*. No explanation is given for the discrepancy in 1946 between the net profit per the annual financial statement of $109,639.18 ($170,865.47 - $61,226.29) and that reported by petitioner on its amended income tax return of $110,896.85.↩